UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

RONALD DICKERSON,

        Plaintiff,

  -v-                                                                      No. 16 CV 2695-LTS

WB STUDIO ENTERPRISES, INC., et al.,

        Defendants.

-------------------------------------------------------x

<u>MEMORANDUM OPINION AND ORDER</u>

        Plaintiff Ronald Dickerson, also known as JD Lawrence, commenced this copyright infringement suit against a number of Defendants on April 12, 2016. On August 8, 2016, Plaintiff filed the operative First Amended Complaint (docket entry no. 47 (the "FAC")), naming as Defendants Metro-Goldwyn-Mayer Studios Inc. ("MGM"), Showtime Networks, Inc. ("Showtime"), and WB Studio Enterprises, Inc. ("WB" and, collectively with MGM and Showtime, "Defendants"). Defendants have now moved to dismiss the FAC pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim for which relief may be granted. The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331.

        The Court has considered carefully the submissions of both parties in connection with the instant motion and, for the following reasons, Defendants' motion to dismiss is granted.

<u>BACKGROUND</u>

        The following recitation of relevant facts is derived from the allegations in the FAC, together with the works at issue, which are "documents attached to the complaint as an exhibit or incorporated in it by reference." <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002).

Plaintiff owns the copyright in the script (the "Script") to a play titled <u>Scissors Cut the Devil Loose</u> ("Scissors"), which copyright was registered in 2000, and in a video recording of Scissors (the "Recording"), which copyright was registered in 2016.[1] (FAC ¶ 13; docket entry no. 51, Declaration of Jonathan Zavin ("Zavin Decl."), at Ex. A (the Script) & Ex. B (the Recording).) Defendants are the owners of the copyrighted works "Barbershop," "Barbershop 2: Back in Business," "Barbershop: The Next Cut," and the "Barbershop" television series (collectively, the "Barbershop Works"). (FAC ¶¶ 24-26.[2]) Plaintiff alleges that the Barbershop Works infringe on his copyright in Scissors. Because the Script and the Recording present very different stories, each will be summarized in turn.

*The Script*

In the Script, the play Scissors tells the story of Job Williams, a twenty-five year old African-American barber who works in a barbershop named Scissors that is owned by an older African-American man named Clarence. At the outset of the play, God and Lucifer have a conversation in which God grants Lucifer permission to "test yet another" as Lucifer once tested Job in the Biblical story, and points to Job Williams as the man whose faith Lucifer may test. (Script pp. 5-7.) The play opens with a series of conversations between Clarence, his son Woody, "Fast Eddie" Thompson (another barber at Scissors), "Mo Money," a drug dealer and small-time merchant, and Precious, a nail technician who is in a relationship with Clarence. Clarence is strict with Woody, and regretful that his son is not more successful. (<u>Id.</u> pp. 9-11.)

---

[1] The FAC does not distinguish between the Script and the Recording when discussing the allegedly copyrighted elements of Scissors.
[2] Plaintiff moved for leave to submit a DVD comparison of the two works that was not properly attached to the appropriate affidavit, which motion is granted. (Docket entry no. 63.)

The early scenes introduce the audience to the relationships among these characters, and it is not until Act I, Scene V, that we are introduced to Job. (Id. p. 20.) Job's religiosity is immediately made clear: he talks about attending nightly services (id. p. 23) and plays Gospel music in the barbershop (id. p. 26). We are also soon introduced to Bishop Jackson, a local priest. (Id. p. 27.) Job is in a relationship with the Bishop's daughter Angela, of which the Bishop does not approve, since the Bishop would prefer Angela to "marry a respectable saved businessman like her father." (Id. p. 29.) Job and the Bishop argue, and after the Bishop leaves, Job sings a Gospel song about the importance of forgiveness titled "Lord bless them anyhow." (Id. pp. 29-31.) After the confrontation between Job and the Bishop, Clarence tells Job that the "Bishop knows a lot of folk" and Clarence is afraid of losing business, and so Job can no longer work at Scissors. (Id. p. 32.) Shortly after this conversation, at the end of Act I, we learn that Job's family was in a car accident with Bishop Jackson. (Id. p. 33.)

Act II is set two months later, with Job's father in a coma after the accident and Job worried about the lawsuit Bishop Jackson filed over the accident. (Id. p. 34.) Job and Mo Money discuss Bishop Jackson's greed, and how he lacks compassion despite being a "man of God." (Id. pp. 34-35.) Following the parallel with the Biblical character, Job is forgiving of Bishop Jackson's flaws and confident that "God puts no more on us than we can bare [*sic*]." (Id. p. 35.) Mo Money tries to persuade Job to ask for his job at Scissors back and earn a living, but Job responds by quoting a verse from the Bible and telling Mo Money that he is not concerned about material possessions. (Id. pp. 35-37.)

Back at Scissors, Clarence and Precious argue over Job's firing, with Precious deciding to leave Clarence because of how he treated Job. (Id. pp. 40-42.) After Precious leaves, Clarence's son Woody comes into Scissors and asks Clarence for money. (Id. p. 43.) As

the two argue, Job passes by, sees the argument, and walks into the barbershop to intercede.  (Id. p. 44.)  They begin to fight, and Clarence pulls out a gun to break up the argument, shoots Woody, realizes what he's done, and passes out in a chair.  (Id. p. 45.)  Job calls an ambulance, but Bishop Jackson walks into the shop and believes Job has just shot Clarence and Woody.  (Id. p. 46.)  The Bishop picks up the gun and shoots Job, waking Clarence, who explains the misunderstanding and takes Job in his arms to get help.  (Id. pp. 46-47.)

In the final scenes, we move forward several years.  Job and Angela have a child, and Precious and Clarence are married.  (Id. p. 48.)  In the final scene, Job greets a customer as the owner of Scissors, letting him know that the "rules" of the shop are "One!  Don't let the devil get you down.  Two!  Know that the battle is not yours it's the Lords [*sic*].  Three!  Know that God is good all the time."  (Id. p. 50.)  The play ends with the voice of God reciting a verse from the Book of Revelation.  (Id.)

*The Recording*

The recording presents a similar, and yet substantively different, play.  In the Recording, Job is HIV-positive, and loses his job at Scissors after Clarence learns this fact.  Clarence later learns more about HIV and comes to accept Job, letting him have his job back.  Although the Recording also contains the altercation between Job, Woody, and Clarence, in the Recording, Clarence beats Woody with a baseball bat in a closet, after which Woody learns his lesson and becomes an employee of the shop.  A prominent plotline in the Recording missing entirely from the Script involves Eddie, a patron of the barbershop, who is homosexual.  Early in the play, Eddie says he needs to work out his homosexuality with God, and by the play's end, he is married to Precious, who is pregnant with his child.  As in the Script, there is a significant

amount of Gospel music throughout the Recording, including a climactic final song during the curtain call.

*Barbershop (2002)*

Because Plaintiff claims that the first Barbershop film, released in 2002, is the only one that directly, rather than derivatively, infringes on Scissors, this discussion will be limited to that work.  (Zavin Decl., Ex. C.)

Barbershop is a comedy film that focuses on a local barbershop run by Calvin, a barber who inherited the shop from his father.  Calvin is not particularly enthusiastic about running the barbershop, and wants to leave the neighborhood he grew up in, and therefore agrees to sell the shop to a man named Lester Wallace, who wants to turn the space into a gentleman's club.  Over the course of the film, however, Calvin realizes the importance of the barbershop to the African-American community, and tries to back out of his deal with Lester.  Lester, however, will only accept double his money, which Calvin cannot afford.  To try to save the barbershop, Calvin enlists the help of Eddie, one of the older barbers, who spends most of his day talking with customers rather than working.

In parallel to the main story, the film follows two thieves who steal an ATM machine from a store near the barbershop.  The pair try, and repeatedly fail, to open the ATM, ultimately leaving it at an auto body shop run by Wallace.  The police investigating the theft turn their attention to one of Calvin's barbers, an ex-convict named Ricky, who had lent the thieves a truck without knowing how it would be used.  Ricky is arrested, and Calvin uses the proceeds from the sale of the barbershop to Wallace to bail Ricky out of prison.

Calvin and Ricky then go to see Wallace at the auto body shop, where they come upon the thieves and Lester.  The shop is raided by the police, who catch the actual thieves.

Wallace agrees to give Calvin his barbershop back, after Calvin threatens to report the stolen car parts in the auto body shop to the police.  Calvin notices a reward sticker on the back of the stolen ATM, and the film cuts forward two months to show Calvin in his thriving barbershop.

## DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A proper complaint cannot simply recite legal conclusions or bare elements of a cause of action; there must be factual content plead that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

A claim of copyright infringement under federal law requires a plaintiff to show "substantial similarity" between the copyrighted work and the allegedly infringing work.  Peter F. Gaito Architecture, LLC v. Simone Development Corp., 602 F.3d 57, 63 (2d Cir. 2010).  A plaintiff fails to state a claim for copyright infringement if, upon consideration of the complaint and the works themselves, the court determines that "the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or . . . no reasonable jury, properly instructed, could find that the two works are substantially similar."  Id. (quoting Warner Bros. Inc. v. Am. Broad. Cos., 720 F.2d 231, 240 (2d Cir. 1983)).  Because "the works themselves supercede and control contrary descriptions of them," Walker v. Time Life Films, Inc., 784 F.2d 44, 48 (2d Cir. 1986), a court may properly make this determination as a matter of law, prior to any discovery, because "what is required is only a . . . comparison of the works." Folio Impressions, Inc. v. Byer Cal., 937 F.2d 759, 766 (2d Cir. 1991).  Here, as noted above, the

works in question – the play Scissors and the Barbershop Works – are appropriately before the Court in the context of this motion to dismiss.

Accordingly, resolution of the instant motion requires the Court to determine whether Plaintiff has adequately alleged that a substantial similarity exists between Scissors and the Barbershop Works. "The standard test for substantial similarity between two items is whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." Peter F. Gaito, 902 F.3d at 66 (quoting Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 111 (2d Cir. 2001)) (internal quotation marks and modifications omitted). The 'ordinary observer' in the context of this test is "an average lay observer," and the relevant question is whether such an observer "would recognize the alleged copy as having been appropriated from the copyrighted work." Knitwaves, Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d 996, 1002 (2d Cir. 1995) (internal quotation marks omitted).

In cases that involve copyrighted works with "both protectable and unprotectable elements," this inquiry must be "more discerning." Peter F. Gaito, 602 F.3d at 66 (quoting Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 123 (2d Cir. 1994)). In such cases, the court "must attempt to extract the unprotectable elements from [its] consideration and ask whether the protectable elements, standing alone, are substantially similar." Knitwaves, Inc., 71 F.3d at 1002 (emphasis omitted). Notably, copyright protection does not extend to "'stock' themes commonly linked to a particular genre" or "'scenes a faire,' that is, scenes that necessarily result from the choice of a setting or situation." Walker, 784 F.2d at 50.

When a plaintiff presents the court with a long list of alleged similarities between the works, the court is "required to determine whether any alleged similarities are due to protected aesthetic expressions original to the allegedly infringed work, or whether the similarity

is something in the original that is free for the taking." Peter F. Gaito, 602 F.3d at 67. In doing so, however, the court is not required "to dissect the works into their separate components, and compare only those elements which are in themselves copyrightable." Id. at 66 (internal quotation marks and modifications omitted). Rather, the court should be "principally guided by comparing the contested [work's] total concept and overall feel with that of the allegedly infringing work." Id. (internal quotation marks omitted). In making these determinations, the court must be guided by the "principle fundamental to copyright law that a copyright does not protect an idea," but only the particular expression of that idea fixed in a copyrighted work. Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996) (internal quotation marks omitted).

Applying these standards, the Court finds, as a matter of law, that Barbershop is not substantially similar to the Script or the Recording of Scissors. A comparison of the "total concept and overall feel" of the works makes the differences between them plain. Scissors is, at its core, a play that conveys a religious message – it draws on Biblical themes, and Gospel songs, and makes repeated references to faith and the importance of belief. Scissors is a dramatic work, though one with humorous asides, that deals with complex themes of fatherhood, sickness, forgiveness, and salvation. The primary dramatic tension in Scissors centers on the travails of Job, who suffers the loss of his job and his parents and must cope with those problems. Barbershop, by contrast, is fundamentally a comedic work. It contains no significant religious themes or subtext. The primary dramatic tension involves the threat of the loss of the barbershop, and the efforts of Calvin to save an important part of his life and the life of his community.

Plaintiff seeks to establish substantial similarity through the aggregation of small elements of Scissors – drawing principally from the Recording – that are comparable in some

way to Barbershop. As an initial matter, this dissection is not the appropriate means by which substantial similarity is to be shown. See Peter F. Gaito, 602 F.3d at 66. A consideration of the elements Plaintiff identifies reveals many of them to be stock elements, or scenes à faire, of a story set in a barbershop or a workplace in general (three barbers' chairs; a pay phone on the wall; one female employee; tension between local businesses). Plaintiff also highlights many aspects of purported character similarity that are equally stock elements (a father figure who is wise and kind; a pregnant woman; a sassy and attractive female employee; a troubled young man wearing a black bandanna).

The few examples Plaintiff provides of direct similarity between Scissors and Barbershop are insufficient to establish substantial similarity of the overall works. For example, Plaintiff highlights the fact that both works contain an ensemble dance sequence. However, in Scissors, there are several such dances, in keeping with the fact that the overall work is a musical. In Barbershop, the dance sequence bears no relationship to the rest of the work (a point Plaintiff acknowledges), and in fact highlights the degree to which Barbershop in general is stylistically dissimilar to Scissors. Plaintiff also focuses on one line of dialogue, comparing Scissors' "Know what I think? I think you want to be me" with Barbershop's "You know what I think? You wish you were me." As an initial matter, these lines are different, and so Plaintiff cannot establish actual copying. Moreover, however, the sum and substance of these lines is not unique to, or a protectable element of, Scissors – they represent the kind of patter that is a stock element of storytelling. On the whole, and having considered each of the alleged similarities Plaintiff identifies and examining the total concept and overall feel of each of the works, the Court concludes that Scissors and Barbershop are not substantially similar as a matter of law, and

that no average lay observer would recognize Barbershop as having been appropriated from Scissors.

Nor has Plaintiff shown that there is "comprehensive non-literal similarity" between the works. See <u>Arica Institute, Inc. v. Palmer</u>, 970 F.2d 1067, 1073 (2d Cir. 1992). Such similarity can only be proven by a demonstration that the defendant has "appropriated the fundamental essence or structure of plaintiff's work." <u>Id.</u> (internal quotation marks omitted). There was no such appropriation here. The similarities Plaintiff identifies do not speak to the fundamental essence of either work – indeed, by picking and choosing among small aspects of each work in search of comparable elements, Plaintiff only highlights the degree to which the works are, at their core, highly distinct creative works. <u>See id.</u> (rejecting a seventy-page set of comparisons between two works as sufficient to demonstrate comprehensive non-literal similarity).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the First Amended Complaint is granted. This Memorandum Opinion and Order resolves docket entry nos. 49 and 63. The Clerk of Court is requested to enter judgment in Defendants' favor and close this case.

SO ORDERED.

Dated: New York, New York
      September 5, 2017

   /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge